UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA　　　　　　CASE NO. 18-cr-00073-01 and 02

VERSUS　　　　　　　　　　　　　　　　JUDGE FOOTE

TIMOTHY STEWART (01)　　　　　　　MAGISTRATE JUDGE HORNSBY
KAMBRIENNE STRINGER (02)

## REPORT AND RECOMMENDATION

**Introduction**

Defendants Timothy Stewart ("Stewart") and Kambrienne Stringer ("Stringer") are charged with conspiracy to distribute and to possess with intent to distribute five grams or more of methamphetamine (count 1). Stewart is also charged with possessing with intent to distribute five grams or more of methamphetamine (count 2), possession of a firearm by a convicted felon (count 3), and possession of a firearm in furtherance of a drug trafficking crime (count 4). Before the court are Defendants' Motions to Suppress. Docs. 27 and 28. After the motions were filed, the court ordered Stringer to file a brief on the issue of standing. Docs. 30 and 31. For the reasons that follow, it is recommended that Defendants' motions to suppress be denied.

**Factual Background**

An evidentiary hearing was held on July 30, 2018. The testimony and evidence at the hearing established the following facts. DEA Task Force Officer Rick Anderson received information from two confidential sources that Defendants were in a relationship

together and that they were selling methamphetamine at local hotels. The informants told Agent Anderson that Stewart's nickname was "Head Shot."

Agents began to conduct surveillance on local hotels in the Shreveport/Bossier City area, but were unable to locate Defendants. One of the informants told Agent Anderson that Stewart had a Facebook page. The informant told Agent Anderson that he (Anderson) could "pretty much know" what Defendants were doing and where they were doing it by watching Stewart's Facebook Live videos. Using an undercover Facebook account, Agent Anderson sent a friend request to Stewart, who accepted. Agent Anderson monitored Stewart's Facebook page for most of the month of November 2017.

On November 28, 2017, Agent Anderson accessed Stewart's Facebook page and noticed that Stewart was recording (or had recently recorded) a video on Facebook Live. Anderson watched the video and saw Defendants together in a hotel bathroom in a very intoxicated state. Stewart was mumbling or rapping into the camera, and Stringer held a handgun up to her face. The camera panned around the hotel bathroom, and Agent Anderson noticed a bong or smoking pipe that is often used for smoking methamphetamine or marijuana. Stewart was very close to Stringer while Stringer was holding the handgun.

Agent Anderson checked Stewart's criminal history and learned that he had been convicted of violent felonies, so Stewart was not allowed to possess a firearm. One of the confidential sources informed Agent Anderson that Defendants often used guns for intimidation and protection during their drug trafficking business.

One of the informants had provided a description of Stewart's vehicle to Agent Anderson. Agent Anderson dispatched several DEA agents to local hotels in an attempt to

locate Stewart's vehicle. The vehicle was located in the Eldorado Casino parking garage on the Shreveport riverfront. DEA agents maintained surveillance on the car while other agents went to the casino's security office to ask about Defendants. Agents learned that Defendants had rented a room (Room 1810) at Eldorado Casino under Stringer's name. Agents began tracking Defendants' movements in the public areas of the casino.

Agents saw Defendants exiting Room 1810 with their luggage as if they were leaving the hotel. The agents made plans to make contact with Defendants. However, Defendants turned around and went back into their room.

Agent Anderson applied for a state search warrant from Caddo Parish District Judge Craig Marcotte. Anderson testified that he asked a state court judge for the warrant (rather than approaching a federal judge) because Anderson believed the case would be a state case.

Agent Anderson's application for the warrant set forth the information that had been learned from the confidential informants regarding Defendants' drug trafficking activities and from the agents' surveillance. The warrant application also referenced a recent mass shooting at a Las Vegas casino. Agent Anderson testified that he included the reference to the Las Vegas shooting in the application because the agents received information from the informants that Stewart had an AK 47 rifle and some handguns. Based on that information, together with Stewart's violent criminal history and the extreme state of intoxication of both Defendants in the Facebook Live video, Anderson believed he had to act quickly to prevent some type of catastrophe such as a shooting. Judge Marcotte signed the warrant

without any hesitation or reservation, and Agent Anderson returned with the warrant to the Eldorado Casino.

Agent Anderson did not want to enter Defendants' hotel room by surprise because he was concerned about public safety and officer safety. The agents also did not want to approach Defendants inside the casino while other patrons were present because the agents believed that Stewart was armed. To avoid that danger, the agents planned to make contact with Defendants as they left the casino.

A short while later, the agents saw Stewart and an unidentified female exit the room. The female was later identified as Amber Ross. Stewart and Ross were approached by the agents as Stewart and Ross neared the casino's exit to the parking garage.

Agent Robert Chapman approached Stewart and conducted a Terry pat-down. Chapman felt a firearm in Stewart's pants pocket and announced, "Gun." Stewart was immediately handcuffed, and Chapman advised Stewart of his Miranda rights. Stewart was wearing multiple pairs of short pants, and the agents had difficulty removing the firearm from his pocket. Agent Paul Hursey eventually used his pocketknife to cut out the liner in the pocket to remove the gun.

About the time the handgun was found on Stewart, Agent Anderson arrived at the scene. Anderson approached Stewart and again advised him of his Miranda rights. Stewart told Anderson that he wanted to cooperate. Anderson told Stewart that the agents wanted to get the AK 47 out of the hotel room or Stewart's vehicle. Stewart told Anderson the rifle was in his car. Anderson asked Stewart for consent to search Stewart's car, and Stewart granted verbal consent. Stewart refused to sign a written consent form because he

did not want his name on the paperwork that might make him be "considered a snitch." Inside the trunk of Stewart's car, the agents found the AK 47, ammunition, and digital drug scales.

Post-Miranda, Ross stated that her boyfriend, Dustin Jackson, was currently in the hotel room with Stringer. She also said that there were weapons and methamphetamine in the room.

The agents continued their surveillance of the hotel room and, during that time, the agents asked Ross if they could look at her phone. With Ross's permission, the agents sent a text message to Dustin Jackson and asked about his location. Jackson responded that he was outside the valet area waiting on a ride.

The agents confronted Jackson and advised him of his Miranda rights. The agents told Jackson that they had detained his girlfriend (Ross), who told the agents that there were weapons and methamphetamine in the room. The agents asked Jackson for permission to search him for weapons and narcotics. Jackson agreed and told the agents that he had a cigarette box containing a small amount of methamphetamine. Jackson told the agents that he stole the methamphetamine from the room just prior to leaving. Jackson said that Stringer was asleep in the room.

Based on Jackson's information, the agents decided to enter the hotel room. Entry was made using a room key which was seized from Stewart during the Terry pat-down. When the agents entered the room, Stringer was sleeping in the bed. The agents Mirandized Stringer, but she appeared to be so impaired that they did not question her at length. Stringer said everything in the room belonged to her.

**Defendants' Motions to Suppress**

Defendants argue that the state search warrant for Defendants' hotel room was not supported by probable cause. Defendants also argue that including information about the mass shooting at a Las Vegas casino casts great doubt on the entire search warrant application. Stewart also argues that his detention was unlawful and cannot be upheld as a valid Terry stop.

**Law and Analysis**

   **A. Validity of the State Search Warrant**

The Fifth Circuit uses a two-step process to analyze a district court's decision to grant or deny a motion to suppress based upon the sufficiency of a warrant. United States v. Moore, 805 F.3d 590, 593 (5th Cir. 2015). The first question is "whether the good faith exception to the exclusionary rule, articulated in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is applicable." Id. The good faith exception provides that, if reliance on a defective warrant is "objectively reasonable," the Fourth Amendment does not require suppression of evidence obtained pursuant to that warrant. Id. If the good faith exception applies, the court need not inquire about probable cause unless the case presents a novel questions of law.  United States v. Mays, 466 F.3d 335,343 (5th Cir. 2006)

The good faith exception does not apply where: (1) the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the issuing judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the warrant; (3) the underlying affidavit is "so lacking in indicia of probable cause as to render

official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient… that the executing officers cannot reasonably presume it to be valid." Mays, supra at 343.

The second question is whether the affidavit established probable cause that the evidence to be seized would be found in the place to be searched, justifying issuance of the warrant. Moore, 805 F.3d at 593. An affidavit in support of a warrant must provide the issuing judge with "a substantial basis for determining the existence of probable cause," and a "wholly conclusory statement" will not suffice. Illinois v. Gates, 462 U.S. 213, 239 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular case." Id. at 238-39. Where an affidavit in support of a warrant relies on statements by a CI, Fifth Circuit courts consider the CI's "veracity, reliability and basis of knowledge as important factors[.]" United States v. Jackson, 818 F.2d 345, 348 (5th Cir. 1987).

None of the Leon exceptions are present. The warrant application for Defendants' hotel room did not contain false information. Instead, the warrant applicant specified that Agent Anderson had received tips from several informants that (1) Defendants sold drugs out of local hotels and (2) the informants saw Defendants with large amounts of methamphetamine and several firearms. The application also stated that Defendants were staying in Room 1810 of the Eldorado casino hotel, which the agents independently

confirmed. Agent Anderson personally observed Stewart's Facebook Live video which depicted Defendants in a severely drugged state around 7:30 a.m. on the day the warrant was requested. The video showed Stringer handling a pistol (in close proximity to Stewart) and drug paraphernalia in the room.

Defendants argue that the reference in the warrant application to the Las Vegas mass shooting falsely implied that Stewart posed a risk to the public. But in reality, the reference to a prior mass shooting at a different casino hotel added nothing of substance to the warrant, except perhaps as to the exigency of gaining access to the room due to Defendants' drug induced states and the presence of firearms. There was probable cause to search Room 1810 even if that information is excluded.

Although the evidence at the hearing explored the reliability of the informants, there was very little about their reliability in the warrant application. The application did contain conclusory statements about their reliability. Most importantly, however, the application detailed the agent's independent investigation and corroboration of the underlying facts. The application also set forth Stewart's relevant criminal history, which included prior arrests for second degree murder, possession of a firearm by a convicted felon, and drug crimes.

In light of the information set forth in the warrant applicaiton, there was probable cause to search the hotel room for drugs and guns, and the agents acted in good faith in relying on the state court warrant.

### B. Stewart's Stop and Detention

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ... but upon probable cause." U.S. Const. amend. IV. A seizure has occurred when "a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). However, "police can stop and briefly detain a person for investigative purposes" without probable cause, referred to as a Terry stop, "if the officer has reasonable suspicion." United States v. Sokolow, 490 U.S. 1, 7 (1989). A Terry stop is warranted if, under the totality of the circumstances, the officer has reasonable suspicion based on "specific and articulable facts" that the person is involved in criminal activity. Terry v. Ohio, 392 U.S. 1, 21-22 (1968).

The Terry inquiry involves examining whether the initial action was justified and, then, determining whether any subsequent action was reasonably related in scope to either the circumstances that justified the stop or to dispelling a reasonable suspicion that developed during the stop. United States v. Brigham, 382 F.3d 500, 506-07 (5th Cir. 2004) (en banc). A Terry detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004).

However, when a Terry stop transforms into a seizure, the officers needs more than reasonable suspicion. United States v. Massi, 761 F.3d 512, 523-24 (5th Cir. 2014). A person is "seized" when "his freedom of movement is restrained" though "means of physical force or a show of authority." Mendenhall, 446 U.S. at 553-54 (noting that the

"threatening presence of several officers, some physical touching ... or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" are examples of "circumstances that might indicate a seizure."). To conduct a seizure, the officer needs probable cause. Massi, 761 F.3d at 523-24.

The agents had abundant reasonable suspicion to approach Stewart (and Ross, who exited the room with him) and pat them down for weapons and illegal drugs. The agents knew Stewart was a convicted felon, and they strongly suspected that he was armed. During the pat down, Agent Chapman felt a gun in Stewart's pocket and announced, "Gun." At that point, the agents had probable cause to seize and handcuff Stewart for possession of a firearm by a convicted felon.

Defendants do not directly challenge the voluntariness of their statements or Stewart's consent to search his vehcile, but the court notes that they were given their Miranda rights (Stewart was advised of his rights at least twice) prior to making any incriminating statements. Defendants were cooperative, and Stewart stated that he wanted to cooperate. He freely and voluntarily spoke to the agents, and he freely and voluntarily granted consent to search his vehicle. There is no hint of coercion, deceit, or other factors that would cast any doubt on that conclusion.

**Conclusion**

For the foregoing reasons, the undersigned concludes that the agents acted in objective good faith on the state court search warrant, and that the stop and detention of Stewart was a valid Terry stop and frisk. There is no basis to suppress the evidence in this case. Accordingly;

It is recommended that Defendants' Motions to Suppress be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 20th day of September, 2018.

Mark L. Hornsby
U.S. Magistrate Judge